NO. COA12-453

NORTH CAROLINA COURT OF APPEALS

Filed: 4 February 2014

JAMES P. TORRENCE, SR., and TONYA
BURKE, on behalf of themselves and
all other persons similarly
situated,
    Plaintiffs

v.

                                  New Hanover County
                                  No. 05 CVS 447

NATIONWIDE BUDGET FINANCE, QC
HOLDINGS, INC., QC FINANCIAL
SERVICES, INC. FINANCIAL SERVICES
OF NC, INC. and DON EARLY,
    Defendants


Appeal by defendants from orders entered 25 January 2012 by Judge D. Jack Hooks, Jr. in New Hanover County Superior Court. Heard in the Court of Appeals 28 November 2012.

*Hartzell & Whiteman, L.L.P., by J. Jerome Hartzell, and North Carolina Justice & Community Development Center, by Carlene McNulty, for plaintiff-appellees.*

*Ellis & Winters LLP, by Paul K. Sun, Jr. and Kelly Margolis Dagger, and Katten Muchin Rosenman LLP, by Claudia Callaway, for defendant-appellants.*

STEELMAN, Judge.


Where the arbitrator named in the arbitration agreement was no longer conducting arbitrations, the trial court erred in not appointing a substitute arbitrator pursuant to § 5 of the Federal

Arbitration Act. Based upon the decisions of the United States Supreme Court in *Concepcion* and *Italian Colors*, the trial court erred in holding that the arbitration agreement was unconscionable and refusing to compel arbitration.

## I. Factual and Procedural History

County Bank of Rehoboth Beach, Delaware ("County Bank"), an FDIC-insured Delaware bank, began offering short-term consumer loans to North Carolina residents in 2002. In March 2003, County Bank retained Financial Services of North Carolina, Inc., ("FSNC") to offer County Bank loans at FSNC locations. Applications for loans were submitted at FSNC locations, and were transmitted to County Bank for approval. Approved applications were sent back by County Bank with a proposed loan agreement.

Between May 2003 and February 2004, James Torrence ("Torrence") applied for eleven County Bank loans or renewals. On each occasion, he signed an identical loan note and disclosure agreement that contained a clause entitled "Agreement to Arbitrate All Disputes."

Between October 2003 and January 2004, Tonya Burke ("Burke") applied for seven County Bank loans and/or renewals. On each occasion, she signed an identical loan note and disclosure

agreement that contained a clause entitled "Agreement to Arbitrate All Disputes."

Each of the loans signed by the plaintiffs with County Bank contained the following arbitration provisions:

**AGREEMENT TO ARBITRATE ALL DISPUTES: You and we agree that any and all claims, disputes or controversies between you and us and/or the Company, any claim by either of us against the other or the Company (or the employees, officers, directors, agents or assigns of the other or the Company) and any claim arising from or relating to your application for this loan or any other loan you previously, now or may later obtain from us, this Loan Note, this agreement to arbitrate all disputes, your agreement not to bring, join or participate in class actions, regarding collection of the loan, alleging fraud or misrepresentation, whether under the common law or pursuant to federal, state or local statute, regulation, or ordinance, including disputes as to the matters subject to arbitration, or otherwise, shall be resolved by binding individual (and not joint) arbitration by and under the Code of Procedure of the National Arbitration Forum ("NAF") in effect at the time the claim is filed.**

**This agreement to arbitrate all disputes shall apply no matter by whom or against whom the claim is filed. Rules and forms of the NAF may be obtained and all claims shall be filed at any NAF office, on the World Wide Web at www.arb-forum.com, by telephone at 800-474-2371, or at "National Arbitration Forum, P.O. Box 50191, Minneapolis, Minnesota 55405." Your arbitration fees may be waived by the NAF in the event you cannot afford to pay them. The cost of any participatory, documentary or telephone hearing, if one is held at your or**

**our request, will be paid for solely by us as provided in the NAF Rules and, if a participatory hearing is requested, it will take place at a location near your residence. This arbitration agreement is made pursuant to a transaction involving interstate commerce. It shall be governed by the Federal Arbitration Act, 9 U.S.C. Sections 1-16. Judgment upon the award may be entered by any party in any court having jurisdiction.**

**<u>NOTICE</u>: YOU AND WE WOULD HAVE HAD A RIGHT OR OPPORTUNITY TO LITIGATE DISPUTES THROUGH A COURT AND HAVE A JUDGE OR JURY DECIDE THE DISPUTES BUT HAVE AGREED INSTEAD TO RESOLVE DISPUTES THROUGH BINDING ARBITRATION.**

**<u>AGREEMENT NOT TO BRING, JOIN OR PARTICIPATE IN CLASS ACTIONS</u>: To the extent permitted by law, you agree that you will not bring, join or participate in any class action as to any claim, dispute or controversy you may have against us, our employees, officers, directors, servicers and assigns. You agree to the entry of injunctive relief to stop such a lawsuit or to remove you as a participant in the suit. You agree to pay the attorney's fees and court costs we incur in seeking such relief. This Agreement does not constitute a waiver of any of your rights and remedies to pursue a claim individually and not as a class action in binding arbitration as provided above.**

<u>SURVIVAL</u>: The provisions of this Note dealing with the Agreement to Arbitrate All Disputes and the Agreement Not To Bring, Join Or Participate In Class Actions shall survive repayment in full and/or default of this Note.

Subsequent to plaintiffs executing the notes containing the arbitration agreements, the National Arbitration Forum ("NAF")

ceased conducting arbitrations, in accordance with the terms of a consent judgment entered into with the Attorney General of Minnesota on 17 July 2009. This judgment arose from allegations of bias on the part of NAF in favor of business claimants against consumer claimants.

On 8 February 2005, plaintiffs filed a complaint in this action as a class action. Plaintiffs alleged that defendants QC Holdings, Inc., QC Financial Services, Inc., and Don Early, under the name Nationwide Budget Finance (collectively, "defendants") violated the North Carolina Consumer Finance Act, the North Carolina unfair trade practices laws, and North Carolina usury laws. Plaintiffs further sought to pierce the corporate veil in order to hold QC Holdings, Inc. and Don Early personally liable. On 11 April 2005, defendants filed an answer, as well as a motion to dismiss for lack of personal jurisdiction and a motion to compel arbitration.

On 25 January 2012, the trial court filed three orders that: (1) denied defendants' motion to compel arbitration; (2) granted plaintiffs' motion for class certification; and (3) denied the motions of QC Holdings, Inc. and Don Early to dismiss for lack of personal jurisdiction.

Defendants appeal.

On 20 June 2013, the United States Supreme Court handed down its decision in *American Express Co. v. Italian Colors Rest.*, ___ U.S. ___, 133 S.Ct. 2304, 186 L.Ed.2d 417 (2013). On 15 July 2013, this Court granted the motion of plaintiffs-appellees to allow the parties to submit supplemental briefs to this Court concerning their respective positions on the impact of the *Italian Colors* decision upon this case. Both plaintiffs and defendants submitted supplemental briefs.

## II. Interlocutory Appeal

The trial court's orders do not constitute a final judgment and are therefore interlocutory. *Veazey v. City of Durham*, 231 N.C. 357, 361-62, 57 S.E.2d 377, 381 (1950). "Generally, there is no right of immediate appeal from interlocutory orders and judgments." *Goldston v. Am. Motors Corp.*, 326 N.C. 723, 725, 392 S.E.2d 735, 736 (1990). However, where an interlocutory order affects a substantial right, an immediate appeal may be taken. N.C. Gen. Stat. § 1-277 (2013).

"The right to arbitrate a claim is a substantial right which may be lost if review is delayed, and an order denying arbitration is therefore immediately appealable." *Howard v. Oakwood Homes Corp.*, 134 N.C. App. 116, 118, 516 S.E.2d 879, 881, *review denied*, 350 N.C. 832, 539 S.E.2d 288 (1999), *cert. denied*, 528 U.S. 1155,

145 L.Ed.2d 1072 (2000). "Jurisdiction in this Court over an interlocutory order is proper where the appeal is from the denial of a motion to dismiss for lack of personal jurisdiction." *Hammond v. Hammond*, 209 N.C. App. 616, 621, 708 S.E.2d 74, 78 (2011) (citing N.C. Gen. Stat. § 1-277(b)).

The trial court's rulings denying defendants' motion to compel arbitration and to dismiss for lack of personal jurisdiction are properly before this Court.

## III. Standard of Review

> The standard governing our review of this case is that "findings of fact made by the trial judge are conclusive on appeal if supported by competent evidence, even if ... there is evidence to the contrary." *Lumbee River Elec. Membership Corp. v. City of Fayetteville,* 309 N.C. 726, 741, 309 S.E.2d 209, 219 (1983) (citation omitted). "Conclusions of law drawn by the trial court from its findings of fact are reviewable *de novo* on appeal." *Carolina Power & Light Co. v. City of Asheville,* 358 N.C. 512, 517, 597 S.E.2d 717, 721 (2004).

*Tillman v. Commercial Credit Loans, Inc.*, 362 N.C. 93, 100-01, 655 S.E.2d 362, 369 (2008).

## IV. Defendants' Motion to Compel Arbitration

The trial court entered a detailed order denying defendants' motion to compel arbitration. This order contained a number of separate rulings. First, the trial court held that "[t]he designation of the National Arbitration Forum ("NAF") as the sole

arbitration provider and the designation of NAF rules were integral features of the arbitration clause." Second, the trial court held that there was not a valid arbitration agreement because of the taint of NAF, "because there was no legally effective and knowing consent." Third, the trial court held as a matter of law that the North Carolina Supreme Court case of *Tillman v. Commercial Credit Loans, Inc.*, 362 N.C. 93, 655 S.E.2d 362 (2008) was not overruled by the United States Supreme Court case of *AT&T Mobility v. Concepcion*, ___ U.S. ___, 131 S.Ct. 1740, 179 L.Ed.2d 742 (2011). Fourth, the trial court held that the arbitration agreement was substantively unconscionable. Fifth, the trial court held that the arbitration agreement was procedurally unconscionable. Sixth, the trial court held that the arbitration clause prohibiting class actions "is an unlawful exculpatory clause and is unenforceable."[1]

## V. Appointment of a Substitute Arbitrator

In their first argument, defendants contend that the trial court erred in not compelling arbitration and appointing a substitute arbitrator. This argument encompasses the first two rulings of the trial court outlined above. We agree.

---

[1] In their Supplemental Memorandum filed 25 July 2013, plaintiffs acknowledged that pursuant to the United States Supreme Court's ruling in *Italian Colors*, the exculpatory clause ground for the trial court's decision "is no longer valid." We therefore do not address this ground in our opinion.

There is no dispute that the parties entered into an agreement for binding arbitration governed by the Federal Arbitration Act ("FAA"), codified at 9 U.S.C. § 1 *et seq.* There is no dispute that NAF can no longer serve as arbitrator of any dispute between the parties, by virtue of the consent judgment entered into with the Attorney General of Minnesota. There is also no dispute that the FAA contains a specific provision that controls a situation where the arbitrator named in the agreement is unable to serve, or the method agreed upon for the selection of the arbitrator fails. § 5 of the FAA provides:

> If in the agreement provision be made for a method of naming or appointing an arbitrator or arbitrators or an umpire, such method shall be followed; but if no method be provided therein, or if a method be provided and any party thereto shall fail to avail himself of such method, or if for any other reason there shall be a lapse in the naming of an arbitrator or arbitrators or umpire, or in filling a vacancy, then upon the application of either party to the controversy the court shall designate and appoint an arbitrator or arbitrators or umpire, as the case may require, who shall act under the said agreement with the same force and effect as if he or they had been specifically named therein; and unless otherwise provided in the agreement the arbitration shall be by a single arbitrator.

9 U.S.C. § 5.

In the recent case of *King v. Bryant*, ___ N.C. App. ___, 737 S.E.2d 802 (2013), we analyzed the effect of § 5 of the FAA upon an agreement to arbitrate. The trial court held that an arbitration agreement, under the terms of which the parties agreed to select three arbitrators, was nothing more than an "agreement to agree" and was an unconscionable agreement. We held that:

> Congress enacted the FAA, 9 U.S.C. § 1 *et seq.*, "[t]o overcome judicial resistance to arbitration," *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443, 126 S.Ct. 1204, 163 L.Ed.2d 1038 (2006), and to declare "a national policy favoring arbitration of claims that parties contract to settle in that manner." *Preston v. Ferrer*, 552 U.S. 346, 353, 128 S.Ct. 978, 169 L.Ed.2d 917 (2008) (quotation marks and citation omitted).

*King*, ___ N.C. App. at ___, 737 S.E.2d at 806. We further held that the trial court had failed to consider the applicability of § 5 of the FAA, which "provides the trial court authority to appoint a panel of arbitrators if the parties cannot come to an agreement." *Id*. at ___, 737 S.E.2d at 807. Indeed, § 5 is explicit on that point, providing a vehicle for the court to appoint an arbitrator where there is evidence that the parties agreed to arbitrate. Similarly, under North Carolina law, "[w]here the mandate of an arbitrator terminates for any reason, a substitute arbitrator shall be appointed according to the rules that were

applicable to the appointment of the arbitrator being replaced."
N.C. Gen. Stat. § 1-567.45(a) (2013).

The specific issue of the enforceability of arbitration agreements with reference to NAF has been addressed in other courts as well.  For example, the United States Court of Appeals for the Seventh Circuit has noted that:

> Two courts of appeals have held that the identity of the Forum as arbitrator is not "integral" to arbitration agreements and that § 5 may be used to appoint a substitute. *Khan v. Dell, Inc.*, 669 F.3d 350 (3d Cir. 2012); *Pendergast v. Sprint Nextel Corp.*, 691 F.3d 1224, 1236 n. 13 (11th Cir. 2012); *Brown v. ITT Consumer Financial Corp.*, 211 F.3d 1217, 1222 (11th Cir. 2000). The Supreme Court must have assumed this in *CompuCredit Corp. v. Greenwood*, --- U.S. ----, 132 S.Ct. 665, 181 L.Ed.2d 586 (2012), which held that claims under the Credit Repair Organizations Act are arbitrable. The agreement in that case specified use of the Forum, see *id*. at 677 n. 2 (Ginsburg, J., dissenting), yet the Court saw no obstacle to enforcing the arbitration clause. We grant that *Ranzy v. Tijerina*, 393 Fed. Appx. 174 (5th Cir. 2010), deems designation of the Forum "important" to arbitration and makes an agreement unenforceable once the Forum becomes unavailable, but *Ranzy* is not precedential. The decisions of the third and eleventh circuits, and the assumption of the Supreme Court, deserve greater weight.

*Green v. U.S. Cash Advance Illinois, LLC*, 724 F.3d. 787, 790 (7th Cir. 2013).  The Seventh Circuit correctly notes that *CompuCredit*, which the United States Supreme Court decided after the 2009

consent judgment against NAF, held that the arbitration clause involving NAF could nonetheless be enforced.

The opinions cited above reaffirm the proposition that the key aspect of the analysis of an agreement to arbitrate is the intent of the parties to arbitrate, not the identity of the arbitrator. We further note the United States Supreme Court's assertion that "[a]lthough § 2's saving clause preserves generally applicable contract defenses, nothing in it suggests an intent to preserve state-law rules that stand as an obstacle to the accomplishment of the FAA's objectives." *Concepcion*, ___ U.S. at ___, 131 S.Ct. at 1748, 179 L.Ed.2d at 753. The United States Supreme Court has made it clear that it will no longer tolerate State courts or laws which seek to frustrate the intent of Congress in enacting the FAA.

We hold that the agreement of the parties evinced a clear intent to resolve disputes through arbitration. The trial court erred in not appointing a substitute arbitrator pursuant to § 5 of the FAA.

The trial court's second ruling was that the lack of impartiality of NAF was a basis for voiding the arbitration agreement. At the time that the defendants' motion to compel arbitration was heard by the trial court, NAF was no longer

conducting arbitration, and since it was not going to arbitrate the claims between the parties, its prior conduct was not a relevant consideration for the trial court. Accordingly, we hold that the trial court erred in considering the lack of impartiality of a body which, the trial court acknowledged, could not serve as an arbitrator in this case.

## VI. Unconscionability

In their second argument, defendants contend that the trial court erred in ruling that the arbitration agreement was unconscionable. This argument encompasses the fourth and fifth rulings of the trial court set forth in Section IV of this opinion. We agree.

## A. *Tillman*

The leading case in North Carolina dealing with unconscionability in the context of an agreement to arbitrate is *Tillman v. Commercial Credit Loans, Inc.*, 362 N.C. 93, 655 S.E.2d 362 (2008). In *Tillman*, plaintiffs obtained loans from defendants. Each of the loan agreements contained arbitration provisions that required any disputes to be resolved by binding arbitration in accordance with the FAA.[2] Plaintiffs filed suit against the

_____

[2] While the agreements called for arbitration under the FAA, the plurality opinion and the concurring opinion of the Supreme Court make no reference to the FAA, and contain no analysis under the

defendant lender seeking damages arising out of the lender's requirement that they purchase single premium credit life insurance in connection with the loans. Defendants sought to compel arbitration. The trial court found the agreement to arbitrate to be unconscionable and unenforceable. On appeal, a divided panel of the Court of Appeals reversed and remanded the case to the trial court for entry of an order to compel arbitration. *Tillman v. Commercial Credit Loans, Inc.*, 177 N.C. App. 568, 629 S.E.2d 865 (2006). On appeal, the North Carolina Supreme Court reversed the Court of Appeals, holding the arbitration agreement to be unconscionable.

In that case, a plurality of three justices concurred in the decision of the Court, two justices concurred in the result only, and two justices dissented. The plurality opinion stated that unconscionability was an affirmative defense, and that the party asserting that defense had the burden of establishing that the agreement was unconscionable. *Tillman*, 362 N.C. at 102, 655 S.E.2d at 369. To establish unconscionability, a party must demonstrate both procedural unconscionability and substantive unconscionability. *Id*. at 102, 655 S.E.2d at 370 (citing *Martin v. Sheffer,* 102 N.C. App. 802, 805, 403 S.E.2d 555, 557 (1991); 1

FAA. The dissent makes only a passing reference to the FAA.

James J. White & Robert S. Summers, *Uniform Commercial Code* § 4-7, at 315 (5th ed. 2006)). While both elements of unconscionability must be present, a court may rule that a contract is unconscionable "when [the] contract presents pronounced substantive unfairness and a minimal degree of procedural unfairness, or vice versa." *Id*. at 103, 655 S.E.2d at 370.

The Supreme Court began its analysis by restating North Carolina's policy in favor of arbitration. *Id*. at 101, 655 S.E.2d at 369. The Court first examined the issue of unconscionability based upon procedural unconscionability:

> In the instant case, the trial court did not explicitly conclude that the facts supported a finding of procedural unconscionability. We note, however, that the trial court made the following finding of fact, which is supported by evidence in the record: "[Mrs.] Tillman and [Mrs.] Richardson were rushed through the loan closings, and the Commercial Credit loan officer indicated where [Mrs.] Tillman and [Mrs.] Richardson were to sign or initial the loan documents. There was no mention of credit insurance or the arbitration clause at the loan closings." In addition, defendants admit that they would have refused to make a loan to plaintiffs rather than negotiate with them over the terms of the arbitration agreement. Finally, the bargaining power between defendants and plaintiffs was unquestionably unequal in that plaintiffs are relatively unsophisticated consumers contracting with corporate defendants who drafted the arbitration clause and included it as boilerplate language in all of their loan agreements. We therefore conclude that

> plaintiffs made a sufficient showing to establish procedural unconscionability.

*Id.* at 103, 655 S.E.2d at 370.

With regard to substantive unconscionability, the Court restated the trial court's conclusion, noting that:

> The trial court found the arbitration clause to be substantively unconscionable because (1) the arbitration costs borrowers may face are "prohibitively high"; (2) "the arbitration clause is excessively one-sided and lacks mutuality"; and (3) the clause prohibits joinder of claims and class actions. We agree that here, the collective effect of the arbitration provisions is that plaintiffs are precluded from "effectively vindicating [their] ... rights in the arbitral forum." *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 90, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000).

*Id.* at 104, 655 S.E.2d at 370-71. Relying on *Green Tree*, and on the Fourth Circuit's decision in *Bradford v. Rockwell Semiconductor Sys., Inc.,* 238 F.3d 549, 556 (4th Cir. 2001), the Court held that, because plaintiffs were financially ill-equipped to cover the costs of arbitration, the "loser pays" provision of the arbitration agreement presented a powerful deterrent. The Court then contrasted arbitration with litigation, and stated that "paying for arbitrators is a significant cost that is simply not faced in filing a lawsuit in court[,]" but that "the trial court found that it is 'unlikely that any attorneys would be willing to

accept the risks attendant to pursuing [these] claims.'" *Id*. at 105, 655 S.E.2d at 371. The Court concluded that "the combination of the loser pays provision, the *de novo* appeal process, and the prohibition on joinder of claims and class actions creates a barrier to pursuing arbitration that is substantially greater than that present in the context of litigation. We agree with the trial court that '[d]efendant's arbitration clause contains features which would deter many consumers from seeking to vindicate their rights.'" *Id*. at 106, 655 S.E.2d at 372.

Finally, the Court examined unconscionability based on the provision prohibiting class actions and joinder. The Court observed that:

> Taken alone, such a prohibition may be insufficient to render an arbitration agreement unenforceable, but *Brenner* instructs that an unconscionability analysis must consider all of the facts and circumstances of a particular case. Therefore, the trial court correctly concluded that a prohibition on joinder of claims and class actions is a factor to be considered in determining whether an arbitration provision is unconscionable.

*Id*. at 107, 655 S.E.2d at 373 (citations and quotations omitted).

The Court observed, however, that:

> In the instant case, the prohibition on joinder of claims and class actions affects the unconscionability analysis in two specific ways. First, the prohibition contributes to

the financial inaccessibility of the arbitral forum as established by this arbitration clause because it deters potential plaintiffs from bringing and attorneys from taking cases with low damage amounts in the face of large costs that cannot be shared with other plaintiffs. Second, the prohibition contributes to the one-sidedness of the clause because the right to join claims and pursue class actions would benefit only borrowers.

*Id*. at 108, 655 S.E.2d 373.

The Court concluded that:

[T]he arbitration clause in plaintiffs' loan agreements is unconscionable and therefore unenforceable. The inequality of bargaining power between the parties and the oppressive and one-sided nature of the clause itself lead us to this conclusion. Through the arbitration clause at issue in this case, defendants have not only unilaterally chosen the forum in which they want to resolve disputes, but they have also severely limited plaintiffs' access to the forum of their choice. Defendants argue that finding this clause to be unconscionable would be "hostile to arbitration." We disagree but at the same time reaffirm this Court's previous statements acknowledging the State's strong public policy favoring arbitration. However, this particular arbitration clause simply does not allow for meaningful redress of grievances and therefore, under *Green Tree*, must be held unenforceable.

*Id*. at 108-09, 655 S.E.2d 373-74.

Our Supreme Court analyzed *Tillman* solely under unconscionability. It did not address any issues under the FAA, which clearly governed the agreement. Further, the Supreme Court

did not have the benefit of two cases subsequently decided by the United States Supreme Court, construing arbitration agreements under the FAA; *AT&T Mobility v. Concepcion*, ___ U.S. ___, 131 S.Ct. 1740, 179 L.Ed.2d 742 (2011), and *American Express Co. v. Italian Colors Rest.*, ___ U.S. ___, 133 S.Ct. 2304, 186 L.Ed.2d 417 (2013).

## B. *Concepcion*

In *Concepcion*, plaintiffs entered into a cellular telephone contract with defendant. This contract included an arbitration provision that contained a class action waiver. Plaintiffs filed a putative class action suit in the federal district court seeking damages for false advertising and fraud. Defendant's motion to compel arbitration was denied by the district court, and this ruling was affirmed by the United States Court of Appeals for the Ninth Circuit. The district court and Court of Appeals relied upon a decision of the California Supreme Court in *Discover Bank v. Superior Court*, 36 Cal.4th 148, 113 P.3d 1100 (2005). The holding in *Discover Bank* was that class waivers in consumer arbitration agreements were unconscionable if the agreement was contained within a contract of adhesion. *Discover Bank*, 36 Cal.4th at 162-63, 113 P.3d at 1110.

The United States Supreme Court recited § 2 of the FAA as follows:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

*Concepcion*, ___ U.S. at ___, 131 S.Ct. at 1745, 179 L.Ed.2d at 750-51 (quotations omitted).

The Supreme Court held that this provision

> permits arbitration agreements to be declared unenforceable "upon such grounds as exist at law or in equity for the revocation of any contract." This saving clause permits agreements to arbitrate to be invalidated by "generally applicable contract defenses, such as fraud, duress, or unconscionability," but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue.

*Id.* at ___, 131 S.Ct. at 1746, 179 L.Ed.2d at 751 (citations omitted). The Court further stated that "[a]lthough § 2's saving clause preserves generally applicable contract defenses, nothing in it suggests an intent to preserve state-law rules that stand as an obstacle to the accomplishment of the FAA's objectives." *Id.* at ___, 131 S.Ct. at 1748, 179 L.Ed.2d at 753. The Court cited to a number of its own prior opinions to emphasize that these prior cases clearly stated that the FAA supersedes any state law that sets aside arbitration agreements or holds them to be

unconscionable upon grounds that are exclusive to arbitration agreements.

The Supreme Court expressly overruled *Discover Bank*, which invalidated class action waivers, holding that it had the effect of "manufacturing" class arbitration, contrary to the express intent of the parties, which was "inconsistent with the FAA." *Concepcion*, ___ U.S. at ___, 131 S.Ct. at 1753, 179 L.Ed.2d at 759. The Court further dismissed the notion that class action waivers somehow prevented consumers from seeking relief.

Subsequent to *Concepcion*, the question of whether the provisions of the FAA superseded state court rulings similar to *Discover Bank* has been discussed in a number of cases. The Fourth Circuit recently followed *Concepcion* in holding that the trial court erred in finding a class action waiver in an arbitration agreement to be unconscionable. *Muriithi v. Shuttle Exp., Inc.*, 712 F.3d 173, 180-81 (4th Cir. 2013). In *Muriithi*, the Fourth Circuit held that the holding of *Concepcion* was broader than simply overruling *Discover Bank*:

> In *Concepcion*, the Supreme Court cautioned that the generally applicable contract defense of unconscionability may not be applied in a manner that targets the existence of an agreement to arbitrate as the basis for invalidating that agreement. 131 S.Ct. at 1746-47. Applying that principle to the *Discover Bank* "rule" at issue, the Court

explained that state law cannot "stand as an obstacle to the accomplishment of the FAA's objectives," by interfering with "the fundamental attributes of arbitration." 131 S.Ct. at 1748.

We recently discussed the holding in *Concepcion* in our decision in *Noohi v. Toll Bros., Inc.*, 708 F.3d 599, 606-07 (4th Cir. 2013). We explained that the holding "prohibited courts from altering otherwise valid arbitration agreements by applying the doctrine of unconscionability to eliminate a term barring classwide procedures." *Id.* (citing *Concepcion*, 131 S.Ct. at 1750-53). Thus, contrary to Muriithi's contention, the Supreme Court's holding was not merely an assertion of federal preemption, but also plainly prohibited application of the general contract defense of unconscionability to invalidate an otherwise valid arbitration agreement under these circumstances. The district court in the present case, deciding the same issue of unconscionability prior to *Concepcion*, reached the opposite conclusion. Accordingly, we conclude that the district court erred in holding that the class action waiver was unconscionable.

*Id.*

### C. *Italian Colors*

In the recent case of *Italian Colors*, the United States Supreme Court considered the question of whether "the Federal Arbitration Act permits courts ... to invalidate arbitration agreements on the ground that they do not permit class arbitration of a federal-law claim[.]" *Italian Colors*, ___ U.S. at ___, 133 S.Ct. at 2308, 186 L.Ed.2d at 423 (citing petition for certiorari).

The United States Court of Appeals for the Second Circuit held that the class action waiver was unenforceable and therefore that arbitration could not proceed. It then held *Concepcion* to be inapplicable because it was a case involving pre-emption.

The Supreme Court reiterated its prior holding that "Congress enacted the FAA in response to widespread judicial hostility to arbitration." *Id*. at ___, 133 S.Ct. at 2308-09, 186 L.Ed.2d at 423-24 (citing *Concepcion*, ___ U.S. at ___, 131 S.Ct. at 1745). Plaintiffs argued that if they were required to arbitrate their claims individually, it would contravene the policies of the antitrust laws. The Supreme Court held that:

> The antitrust laws do not "evinc[e] an intention to preclude a waiver" of class-action procedure. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 628, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). The Sherman and Clayton Acts make no mention of class actions. In fact, they were enacted decades before the advent of Federal Rule of Civil Procedure 23, which was "designed to allow an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki,* 442 U.S. 682, 700-701, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979). The parties here agreed to arbitrate pursuant to that "usual rule," and it would be remarkable for a court to erase that expectation.

*Id*. at ___, 133 S.Ct. at 2309, 186 L.Ed.2d at 424-25.

Plaintiffs then advanced the argument that there was a judge-made exception to the FAA that allowed courts to invalidate agreements that prevent the "effective vindication" of a federal statutory right. While acknowledging the existence of the cases dealing with "effective vindication," the Supreme Court held that:

> The class-action waiver merely limits arbitration to the two contracting parties. It no more eliminates those parties' right to pursue their statutory remedy than did federal law before its adoption of the class action for legal relief in 1938[.]

*Id*. at ___, 133 S.Ct. at 2311, 186 L.Ed.2d at 426 (citations omitted).

The Supreme Court then concluded:

> Truth to tell, our decision in *AT&T Mobility* all but resolves this case. There we invalidated a law conditioning enforcement of arbitration on the availability of class procedure because that law "interfere[d] with fundamental attributes of arbitration." 563 U.S., at ----, 131 S. Ct. 1740, 179 L. Ed. 2d 742. "[T]he switch from bilateral to class arbitration," we said, "sacrifices the principal advantage of arbitration—its informality—and makes the process slower, more costly, and more likely to generate procedural morass than final judgment." *Id*., at ----, 131 S. Ct. 1740, 179 L. Ed. 2d 742. We specifically rejected the argument that class arbitration was necessary to prosecute claims "that might otherwise slip through the legal system." *Id*., at ----, 131 S. Ct. 1740, 179 L. Ed. 2d 742.

*Id*. at ___, 133 S.Ct. at 2312, 186 L.Ed.2d at 427.

## D. Conclusions from *Tillman*, *Concepcion* and *Italian Colors*

The FAA embodies a strong Congressional policy in favor of arbitration. *Concepcion* and *Italian Colors* clearly state that the United States Supreme Court is weary of state and federal trial courts assisting plaintiffs in getting around the mandatory provisions of the FAA. While both *Concepcion* and *Italian Colors* dealt with class action waivers, underlying those decisions was a broader theme that unconscionability attacks that are directed at the arbitration process itself will no longer be tolerated. *See Muriithi*, *supra*.

This places the North Carolina Court of Appeals in the difficult position that the holdings of the North Carolina Supreme Court in *Tillman* conflict with those of the United States Supreme Court in *Concepcion* and *Italian Colors*. Ultimately, we are bound by the decisions of the United States Supreme Court construing federal laws, such as the FAA. *In re Fifth Third Bank, Nat. Ass'n*, ___ N.C. App. ___, ___, 716 S.E.2d 850, 855 (2011) (quoting *Dooley v. Seaboard Air Line Ry. Co.*, 163 N.C. 454, 457–58, 79 S.E. 970, 971 (1913)). Certain of the holdings of *Tillman* may be distinguished, because even though arbitration provisions of the *Tillman* contract referred to the FAA, none of the analysis

contained in either the plurality or concurring opinions discussed the FAA and federal law principles.

As noted in Section VI-A of this opinion, a key element of the plurality opinion in *Tillman* on unconscionability is the section dealing with substantive unconscionability. Our Supreme Court cited three factors, the collective effect of which was to preclude plaintiffs from effectively vindicating their rights in an arbitration proceeding. First was the "prohibitively high" potential arbitration costs. *Tillman*, 362 N.C. at 104, 655 S.E.2d at 370-71. In *Italian Colors*, the United States Supreme Court expressly rejected the model proposed by the Court of Appeals for the Second Circuit, which would have required "that a federal court determine (and the parties litigate) the legal requirements for success on the merits claim-by-claim and theory-by-theory, the evidence necessary to meet those requirements, the cost of developing that evidence, and the damages that would be recovered in the event of success." *Italian Colors*, ___ U.S. at ___, 133 S.Ct. at 2312, 186 L.Ed.2d at 427. The Supreme Court went on to hold that the imposition of such a "preliminary litigating hurdle" at the point in the proceedings where the issue was whether or not the parties were to proceed to arbitration "would undoubtedly destroy the prospect of speedy resolution that arbitration in

general and bilateral arbitration in particular was meant to secure." *Id.* We can only construe this language as eliminating the type of cost analysis applied by the North Carolina Supreme Court in *Tillman*.

Second, the North Carolina Supreme Court in *Tillman* held that there was substantive unconscionability based upon the arbitration clause being "excessively one-sided and lack[ing] mutuality[.]" *Tillman*, 362 N.C. at 104, 655 S.E.2d at 371. The United States Supreme Court in *Concepcion* noted, however, that "the times in which consumer contracts were anything other than adhesive are long past." *Concepcion*, ___ U.S. at ___, 131 S.Ct. at 1750, 179 L.Ed.2d at 755. The Court in *Concepcion* was dismissive of the idea that an arbitration agreement, apart from any other form of contract, could be found substantively unconscionable based solely upon its adhesive nature. This was an explicit part of the Supreme Court's reasoning in overruling *Discover Bank*. We must therefore hold that the one-sided quality of an arbitration agreement is not sufficient to find it substantively unconscionable.

Third, the North Carolina Supreme Court in *Tillman* held that there was substantive unconscionability based upon the arbitration provision "prohibit[ing] joinder of claims and class actions." *Tillman*, 362 N.C. at 104, 655 S.E.2d at 371. Both *Concepcion* and

*Italian Colors* hold that a class action waiver does not render an arbitration agreement unconscionable. *Italian Colors* specifically holds that a party can "effectively vindicate" their rights in the context of a bilateral arbitration. *Italian Colors*, ___ U.S. at ___, 133 S.Ct. at 2311, 186 L.Ed.2d at 426.

Thus, the legal theories upon which *Tillman*'s substantive unconscionability analysis is based have been undermined by subsequent decisions of the United States Supreme Court in the context of cases under the FAA.

### E. Ruling of the Trial Court

The trial court in the instant case, relying upon *Tillman* as precedent, made the following findings of fact as to substantive unconscionability:

H. <u>SUBSTANTIVE UNCONSCIONABILITY</u>.

42. No individual arbitration cases have ever been brought challenging payday lending in North Carolina, either against the defendants in this case or against any other payday lenders. In light of the large number of North Carolina payday loan transactions that were undertaken by these defendants and the defendants in the other class cases after the statutory authority for payday lending in North Carolina expired on August 31, 2001, and in light of the evidence that all payday lenders required customers to sign loan agreements with arbitration clauses prohibiting participation in class actions, the complete absence of any individual arbitration cases tends to confirm that legal

challenges to North Carolina payday lending conducted in cooperation with out-of-state banks could not be challenged in individual arbitration cases.

43. The language calling for arbitration before the NAF required plaintiffs to submit claims to an arbitration organization that sought to build business by encouraging relationships and providing accommodations to debt-collector arbitration claimants, and that on June 27, 2007, sold a 40% ownership interest to participants in the consumer debt collection industry. The NAF's lack of neutrality affected arbitrator selection. The arbitration clause requiring arbitration before the NAF was substantively unconscionable.

44. Plaintiffs offered the affidavit and deposition testimony of attorneys George Hausen, Glenn Barfield and Kenneth Schorr, with live testimony of Mr. Barfield and Mr. Hausen, each offering their opinion it was unlikely an individual payday borrower, proceeding on an individual (non-class) basis, would be able to obtain legal counsel to prosecute claims against defendants such as those raised in this proceeding.

45. The Court notes that each of these witnesses has been involved in recruiting North Carolina lawyers to take civil cases on behalf of low and moderate income persons in North Carolina, specifically including efforts to recruit lawyers both on a pro bono basis and on a fee basis. Mr. Hausen is and since 2002 has been the Executive Director of Legal Aid of North Carolina. Mr. Schorr is the Executive Director of Legal Services of the Southern Piedmont, a nonprofit indigent civil legal services program, serving Charlotte and the western part of North Carolina. Mr. Barfield is a lawyer in private practice who

is past president of Legal Services of North Carolina, Inc., and past chairman of the board of directors of Legal Aid of North Carolina. Both Mr. Hausen and Mr. Schorr are and have since 2005 been members of the North Carolina Equal Access to Justice Commission. Accordingly, the Court finds that these witnesses are particularly knowledgeable as to what cases North Carolina lawyers will accept, both on a fee basis and on a pro bono basis.

46. The Court accepts the testimony of Messrs. Barfield, Hausen and Schorr as experts. In addition, because the Court has had the opportunity to observe the demeanor of Mr. Hausen and Mr. Barfield, witnesses, the Court attaches particular weight to their testimony.

47. Mr. Barfield opined that, given the complexity involved in cases challenging payday lending in North Carolina presenting questions such as are in issue in this case, coupled with the motivation of the defendants to vigorously defend, the necessity for out-of-pocket expenditures, the uncertainty of prevailing and the lack of ability to use precedent in an arbitration forum, it is very unlikely that any North Carolina lawyer would be willing to bring such an individual case in arbitration. Mr. Barfield regularly represented defendants/counterclaimants in cases brought by "debt buyers" in counties close to his office. He wrote a manuscript to encourage attorneys across the state to engage in this work, but had virtually no success. In Mr. Barfield's opinion, the complexity of payday lending cases such as this case far exceeds the complexity of the cases he handled on behalf of consumers in the debt buyer cases. Mr. Barfield testified that it is simply not economically feasible to prosecute payday lending cases such as this case, in court or in arbitration on an individual basis.

48. Mr. Hausen opined that it is very unlikely that a payday borrower would be able to get representation from a Legal Aid or pro bono attorney in North Carolina. The demand for services far exceeds the capacity to provide legal representation. Legal Aid offices across the state prioritize cases involving basic needs such as preservation of shelter, access to health care, access to public benefits such as food stamps and Medicaid, and protection from domestic violence. Neither Legal Aid nor, in Mr. Hausen's opinion, the private attorneys whom [L]egal Aid recruits to act as pro bono volunteer attorneys, would have the resources to act as attorneys for individual payday borrowers. While his office has devoted significant resources to foreclosure defense, including developing and implementing a series of training events for the private bar as a way to encouraging [sic] referrals, it is not likely that such an effort would be replicated in an effort to represent payday lending borrowers. Neither Legal Aid nor the volunteer attorneys recruited to assist Legal Aid have enough resources to accept cases seeking the return of money from payday lenders.

49. Mr. Schorr testified that in his opinion, people who were payday lending borrowers would not be able to find attorneys at private firms or with nonprofit organizations to handle their claims on an individual basis. He testified that the amount of damages and attorneys' fees involved was not nearly at the threshold that would make it likely that a private attorney would take such a [c]ase, and that nonprofit agencies would not handle them.

50. Messrs. Barfield, Hausen and Schorr each opined that because the stakes of an individual arbitration on behalf of a payday borrower are so small, no attorney would be willing to pursue a claim on behalf of a payday

borrower on an individual basis. They go further to state that this is true despite the availability of statutory attorney fees under G.S. § 75-1.1 *et seq*. The individual claims for individual borrowers that are at issue in this case are in fact modest in amount. Plaintiffs represent that Mr. Torrence's largest damages claim is for treble the amount of his net interest, which, after trebling, is a total of $2,788.50. Ms. Burke's largest claim is for recovery of all amounts paid, but without trebling, which is a total of $561.

51. These witnesses also opined that because of the nature of the claim and the federal preemption issue, the claims in the instant case are complex. The instant case is complex because defendants contend they were engaged in marketing and servicing loans for County Bank. The Consumer Finance Act provides an exemption for banks. Under federal preemption laws, banks are not subject to state interest rate limits. To prove that defendants are subject to the CFA, a consumer must respond to defendants' claims concerning exemption and preemption. The complexity and proof will be substantially the same regardless of whether a claim is asserted on behalf of a single individual or on behalf of a class.

52. The CFA assigns regulatory responsibility over the small loan business to the North Carolina Commissioner of Banks. The Commissioner of Banks conducted an administrative case against Advance America, to determine whether that company was in violation of the CFA by conducting payday lending in North Carolina in cooperation with an out-of-state bank. An order in that case was rendered on December 22, 2005 (the "COB Opinion"), ruling that Advance America was in violation of the CFA.

53. The COB Opinion reflects that the issue of

whether payday lenders can avoid application of the CFA by entering into contracts with banks is complicated. The COB Opinion is 54 single spaced pages and has 292 footnotes. Following an appeal, the COB Opinion was affirmed by order rendered by Judge Donald W. Stephens of Wake County Superior Court on March 29, 2010, who found that the required analysis is "heavily fact dependent," and that Advance America's claim to preemption was "not supported by the facts in this matter."

54. A legal challenge to the issue of whether defendants are lawfully permitted to participate in payday lending in North Carolina by purporting to act on behalf of an out-of-state bank would present a fundamental issue concerning whether defendants and other payday lenders with similar bank arrangements could continue to operate in North Carolina. A legal challenge over such a fundamental issue should be expected to give rise to a vigorous defense supported by resources that are more substantial that the amount in controversy in a single individual arbitration.

55. The successful prosecution of an individual claim that defendants in this case violated the CFA will likely require factual development through depositions, document review and expert analysis, just as the COB Opinion reflected factual development through depositions, document review and expert analysis.

56. The COB Opinion devoted substantial attention to financial relationships between Advance America and the various banks, to the actual results of such financial relationships, to the historical development of the relationships, to the companies' apparent business objectives, and similar

matters.

57. Plaintiffs have submitted the affidavits and depositions of two financial experts. One of these experts, Ronald E. Copley, holds a Ph.D. in Finance, has been a tenured professor of Finance at the University of North Carolina at Wilmington, is a Chartered Financial Analyst, and is a licensed investment advisor. Dr. Copley reviewed the COB Opinion and has opined that it would require a minimum of 100 hours to perform financial analysis similar to the analysis performed by the Commissioner of Banks. The other of these experts, Michael J. Minikus, is a North Carolina certified public accountant. Mr. Minikus has opined that it would require a minimum of 65 hours to perform an analysis similar to the analysis performed by the Commissioner. Dr. Copley charges $225 per hour for his services. Mr. Minikus charges $125 per hour for his services. Regardless of how many hours must be devoted to analysis by a finance professional or a certified public accountant, the costs of such experts are likely to exceed the amount in controversy in an individual case.

58. Regardless of whether the instant case will require as much analysis as set out in the COB Opinion, the legal issues in this case are too factually and legally complex to be addressed in an arbitration case involving only the amount of damages that would be at issue for a single plaintiff, because the time and expense required to be invested in such a case would be substantially in excess of the amount that could be recovered if the case was successful.

59. Defendants tendered the testimony of two North Carolina lawyers, Samuel Forehand and Woodward Webb, who stated that, in their opinion, some North Carolina lawyer would probably be willing to bring individual payday

loan arbitration cases.

60. Attorneys Forehand and Webb acknowledged that they did not consider the complexities of a CFA case challenging payday lending in North Carolina done in cooperation with a bank, such as the preemption issue and the other issues identified in the COB Opinion. Mr. Webb provided representative examples of cases brought by consumer attorneys in North Carolina and other states in an effort to support his opinion that attorneys would accept representation on behalf of a payday borrower. None of these cases, however, involved usury claims, federal preemption, claims against a bank or a need for expert witness testimony. Until the preemption issues were brought to his attention at his deposition, Mr. Forehand was not aware that such a defense was likely to be involved in this case. Mr. Forehand acknowledged that he had no basis for disputing this Court's earlier finding in prior cases that litigating the preemption issue will require extensive deposition, document review and expert analysis as is reflected by the order of the Commissioner of Banks, or that the cost of expert witnesses alone would likely exceed the amounts at issue in individual cases.

61. The significance of the opinion testimony by attorneys Forehand and Webb is also diminished by their failure to identify any North Carolina lawyers who would in fact take such cases. Mr. Webb acknowledged that he would not accept one of these cases himself. In his deposition Mr. Webb mentioned three attorneys whom he thought might. However one of the attorneys mentioned was no longer in practice, and the other two attorneys signed affidavits stating that they would not take such cases on an individual basis. In his hearing testimony Webb mentioned a fourth attorney, but merely said he had spoken with

the attorney in passing who said he would "look at it."

62. Defendants have objected to the tender of affidavits of expert witnesses who were not identified in interrogatory responses. The Court understands this to be an objection to Plaintiffs' Exhibits 47-49 (affidavits of Carlene McNulty, John Van Alst and M. Jason Williams). These affidavits are directed simply to the issue of three specific lawyers' willingness to take on individual cases challenging bank-contract payday lending. The objections are overruled.

63. Mr. Forehand testified that he would need to undertake a detailed case acceptance analysis before deciding whether he would take one of these cases, which he has not yet been able to complete; that even if he went through the process outlined in his affidavit, he would not be competent to state whether he would file an individual arbitration claim, having no prior experience with arbitration; and that he could not identify any attorney willing to represent a payday borrower or even meet with a payday borrower.

64. Defendants introduced two letters written by attorneys in North Carolina as evidence to show that payday lending borrowers were able to find legal representation. One letter made allegations that the payday loan was illegal and demanded that the payday loan company cease collection efforts. The other letter alleged that a payday borrower's check had been cashed prematurely. The defendants presented no evidence indicating that any relief was provided to the clients as a result of either letter, and no evidence that either of these attorneys undertook further representation on behalf of these borrowers or any other borrowers such as filing suit in court.

65. Even if North Carolina attorneys were willing to pursue an individual arbitration on behalf of an individual payday borrower, it is unlikely that payday borrowers generally would be able to obtain legal representation for individual claims, given all witnesses' inability to identify any lawyer who would accept such individual cases.

66. It is extremely unlikely that payday borrowers could effectively represent themselves in pro se litigation or arbitration against defendants in light of the complexity of the issues, including the factual and legal basis for federal preemption and statutory exemption.

67. Unless consumers received legal assistance that involved analyzing the legal legitimacy of payday lenders' claims to federal preemption and exemption, consumers would be unaware that they possessed any sound basis for a legal claim.

68. Defendants' witness Stephen Ware opined that NAF arbitration afforded consumers a reasonably accessible forum. Mr. Ware has never practiced law in North Carolina and has no familiarity with North Carolina law or North Carolina lawyers, and did not identify any North Carolina lawyer who is willing to take individual payday loan cases such as the instant case. Mr. Ware also did not review any pleadings in this case other than the complaint, did not review any of the briefs, affidavits or depositions in the case; and did not know what plaintiffs would have to prove in order to prevail. He had no opinion as to how many witnesses would be required to make out a claim, or whether expert testimony would be required; and had no knowledge of whether proof of intent would be required.

69. Mr. Ware based his opinion that NAF arbitration afforded consumers a reasonably accessible forum, by comparing the NAF to our court system as he contends it actually exists. Mr. Ware testified that, even taking the allegations of bias and corruption asserted by former managerial employee Deanna Richert as true, the NAF compares favorably to our court system, "given the pressure on a judge to rule in a particular way from a governor or legislator or a contributor to a judge's campaign."

70. Mr. Ware further based his opinion that NAF arbitration afforded consumers a reasonably accessible forum on information that thirteen individual arbitration claims had been advanced by Texas attorney Brian Blakeley in arbitration cases before the American Arbitration Association in which Mr. Blakeley contended that "QC Financial Services of Texas, Inc. was the 'true' lender for these payday loan transactions and that the fees collected by respondent constitute a deceptive practice and that the respondent has violated the Texas Credit Services Organization Act and/or engaged in usury."

71. Mr. Blakeley provided an affidavit which was introduced in evidence in the present case, and Mr. Blakeley was deposed by defendants. According to his affidavit, Mr. Blakeley began pursuing cases against Texas "credit service organizations" ("CSO's") in late 2009, and sought to assert usury claims on the ground that fees paid by his clients that were purportedly credit service organizations fees "should be considered to be interest because the CSO should be regarded as the true lender in the transaction; or because the relationship between the CSO and the purported lender is such that the purported lender and the CSO are not truly independent." Mr. Blakeley attached to his affidavit a Texas

Attorney General letter opining that "[determining the true relationship between a CSO and a lender would be a fact intensive endeavor."

72. However Mr. Blakeley stated in his affidavit and testified at his deposition that he had abandoned usury claims against Texas CSO's and was no longer asserting usury claims in connection with payday lending in Texas. Mr. Blakeley opined that "it is not possible to pursue usury claims on an individual basis in individual arbitrations conducted by the [AAA] for the following reasons," and gave five reasons that he believed such claims could not be pursued in AAA consumer proceedings.

73. Mr. Blakeley was deposed by defendants and provided testimony consistent with his affidavit. He continues to accept payday lending clients, and has been successful in seven out of twenty-two arbitration claims so far in cases involving Texas law disclosure claims unlike the claims in the present case. However, Mr. Blakeley has unequivocally abandoned all claims for usury and has no intention of bringing those claims in the future. Whether or not his decision to abandon these claims is because Mr. Blakeley is "lazy" as characterized by defendants or because the claims are not economically viable, the fact remains that Mr. Blakeley is not providing legal representation to Texas payday borrowers with fact-intensive claims concerning payday lenders' business relationships with third parties, and is not providing (nor has ever provided) any representation to North Carolina payday borrowers.

74. Mr. Blakeley practices law exclusively in Texas, and is not licensed to practice law in North Carolina. The claims brought by Mr. Blakeley in the payday arbitration cases were

brought under Texas law, not North Carolina law.

75. The Court finds that payday borrowers would not be able to effectively vindicate the type of claims raised by plaintiffs here, even if the claims are legally justified and correct, if payday borrowers are required to proceed on an individual rather than class basis. The facts demonstrate that this conclusion is true, regardless of whether consumers were to attempt to pursue their claims in court or in arbitration.

76. The North Carolina Attorney General filed an amicus brief in *Kucan v. Advance America*, a North Carolina payday lending case alleging similar legal issues as are alleged in the instant case, stating that "no Attorney General will ever have the funds or personnel to pursue every remedy against every person or company preying on North Carolina customers" and that "it is critically important that consumers be able to rely on the private bar— as the legislature intended— for assistance in obtaining restitution for injuries caused by unfair or deceptive business practices."

77. Defendants' practice of holding customer checks as security for loans gave defendants considerable leverage in the event of a nonpayment or dispute, making resort to court or arbitration unnecessary: if the customer failed to pay defendants could simply deposit the check, either resulting in payment to defendants or causing the customer to be faced with the legal and practical consequences of having their check bounce.

78. The arbitration agreements restrict customers from bringing a class action. The agreement contains no corresponding prohibition against County Bank or any of the defendants bringing or participating in a

class action.

This type of detailed analysis of the types of evidence required for plaintiffs to pursue their claims and of the potential costs of obtaining such evidence, at the stage of the proceeding where the court determines whether the case should be sent to arbitration, is precisely the approach rejected by the United States Supreme Court in *Italian Colors*. *See Italian Colors*, ___ U.S. at ___, 133 S.Ct. at 2312, 186 L.Ed.2d at 427. This type of analysis, based upon extensive evidentiary presentation, is not only costly, but defeats the very purpose of arbitration, which is for the parties to have a quick, expedited resolution of their dispute.

We hold that, based upon *Italian Colors*, the trial court erred in ruling that the arbitration agreement was substantively unconscionable. In the absence of substantive unconscionability, the entire unconscionability analysis must fail. *See Tillman*, 362 N.C. at 102-03, 655 S.E.2d at 370. Because there was no substantive unconscionability, it is not necessary to review procedural unconscionability. The trial court erred in not granting defendants' motion to compel arbitration.

VII. Impact of *Concepcion* upon *Tillman*

Finally, the third basis of the trial court's decision in the instant case (as set forth in Section IV of this opinion) was that *Concepcion* did not affect the *Tillman* analysis.

The trial court in the instant case acknowledged that *Concepcion* overruled *Discover Bank*. It concluded, however, that *Discover Bank* was distinct from *Tillman*, because where *Discover Bank* featured a "rule of automatic invalidation, in a case in which the plaintiff would be able to effectively vindicate his rights in arbitration[,]" *Tillman* involved "consideration of all facts and circumstances[.]" The trial court concluded that *Tillman* applied because "the instant case involves plaintiffs who would not be able to effectively vindicate their rights in NAF arbitration."

The trial court's attempt to distinguish *Concepcion* from *Tillman* was in error. *Concepcion*, in overruling *Discover Bank*, made clear that the FAA preempts any state law that prevents bilateral arbitration of claims. *Concepcion*, ___ U.S. at ___, 131 S.Ct. at 1747, 179 L.Ed.2d at 752 (holding that "[w]hen state law prohibits outright the arbitration of a particular type of claim, the analysis is straightforward: The conflicting rule is displaced by the FAA"). This applies regardless of whether the state standard is "a rule of automatic invalidation," as in *Discover*

*Bank*, or "consideration of all facts and circumstances[,]" as in *Tillman*.

The trial court further concluded that the fact that the agreement was non-negotiable, along with the fact that "all payday lenders doing business in North Carolina required borrowers to execute loan agreements containing arbitration clauses prohibiting participation in class actions[,]" was further evidence of unconscionability. Yet the United States Supreme Court observed in *Concepcion* that "the times in which consumer contracts were anything other than adhesive are long past." *Id*. at ___, 131 S.Ct. at 1750, 179 L.Ed.2d at 755. That Court observed in a footnote that:

> Of course States remain free to take steps addressing the concerns that attend contracts of adhesion—for example, requiring class-action-waiver provisions in adhesive arbitration agreements to be highlighted. Such steps cannot, however, conflict with the FAA or frustrate its purpose to ensure that private arbitration agreements are enforced according to their terms.

*Id*., fn. 6. The United States Supreme Court's position is explicit – where the FAA governs, state laws (including *Tillman*) cannot carve out exceptions.

## VII. Personal Jurisdiction

In their third argument, defendants contend that the trial court erred in exercising personal jurisdiction over defendant Don Early. However, because we have previously determined that the case should have been submitted to arbitration, the matter was not properly before the trial court. We therefore need not address defendants' contention that personal jurisdiction was improper. *See, e.g., Miller v. Two State Const. Co., Inc.*, 118 N.C. App. 412, 418, 455 S.E.2d 678, 682 (1995) (holding that where the arbitration agreement was valid, we "need not address the other issues raised by defendants"). These issues are properly to be determined by an arbitrator.

## VIII. Conclusion

The United States Supreme Court has made it clear that the use of unconscionability attacks directed at the arbitration process can no longer serve as a basis to invalidate arbitration agreements. The intent of Congress in enacting the FAA was to overcome judicial hostility to arbitration.

The trial court erred in not designating a substitute arbitrator in this case pursuant to § 5 of the FAA; in determining that the arbitration was unconscionable; and in not entering an order compelling arbitration.

The orders of the trial court denying defendants' motion to compel arbitration, granting plaintiffs' motion for class certification, and denying the motions of QC Holdings and Don Early to dismiss for lack of personal jurisdiction are vacated, and this matter is remanded to the trial court for entry of an order directing that the parties arbitrate plaintiffs' claims, and appointing a substitute arbitrator.

VACATED AND REMANDED.

Judges STEPHENS and McCULLOUGH concur.