An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of A p p e l l a t e    P r o c e d u r e .

NO. COA13-1003
NORTH CAROLINA COURT OF APPEALS

Filed: 15 July 2014

ROBERT E. KING and wife,
JO ANN O'NEAL,
    Plaintiffs,

    v.                       Cumberland County
                                    No. 11 CVS 8280
MICHAEL S. BRYANT, M.D., and
VILLAGE SURGICAL ASSOCIATES, P.A.,
    Defendants.

Appeal by Defendants from Order entered 10 May 2013 by Judge Lucy N. Inman in Cumberland County Superior Court. Heard in the Court of Appeals 22 January 2014.

> *Beaver, Holt, Sternlicht & Courie, P.A., by Mark A. Sternlicht, for Plaintiffs.*

> *Walker, Allen, Grice, Ammons & Foy, L.L.P., by O. Drew Grice, Jr., for Defendants.*

STEPHENS, Judge.

*I. Factual Context and Procedural Posture*

This case arises from a medical malpractice action filed by Plaintiffs Robert E. King and Jo Ann O'Neal on 28 September 2011 in Cumberland County Superior Court. Therein, Plaintiffs allege

that Defendant Michael S. Bryant negligently performed a laparoscopic bilateral inguinal hernia repair on King on 14 May 2009. On 4 November 2011, Defendants submitted a motion to stay proceedings in superior court and to enforce an agreement to alternative dispute resolution ("the arbitration agreement") between the parties. Plaintiffs moved the court to deny that motion on 16 November 2011, asserting that the arbitration agreement is not enforceable.

In pertinent part, the arbitration agreement provides as follows:

**Village Surgical Associates, PA**

**Agreement to Alternative Dispute Resolution**

**In accordance with the terms of the Federal Arbitration Act, 9 USC 1-16, I agree that any dispute arising out of or related to the provision of healthcare services by me, by Village Surgical Associates, PA, or its employees, physician members and agents, shall be subject to final and binding resolution through private arbitration.**

The parties to this Agreement shall agree upon three Arbitrators and at least one arbitrator of the three shall be a physician licensed to practice medicine and shall be board certified in the same specialty as the physician party. The remaining Arbitrators either shall be licensed to practice law in NC or licensed to practice medicine in NC. The parties shall agree upon all rules that shall govern the arbitration, but may be guided by the Health Care Claim Settlement

> Procedures of the American Arbitration Association, a copy of which is available to me upon request. I understand that this agreement includes all health care services which previously have been or will in the future be provided to me, and that this agreement is not restricted to those health care services rendered in connection with any particular treatment, office or hospital admission. I understand that this agreement is also binding on any individual or entity and not a precondition to receiving health care services.
>
> . . . .

(Emphasis in original). The arbitration agreement was signed on 29 April 2009, approximately two weeks before King's surgery.

A hearing on Defendants' motion was held on 12 March 2012. The trial court issued an order that same day, denying Defendants' motion on the grounds that the arbitration agreement: (1) "leaves material portions open to future agreements by providing, *inter alia*, that the parties shall agree upon three arbitrators and . . . agree upon all rules that shall govern the arbitration"; (2) is an "agreement to agree"; and (3) is not a binding contract. Defendants appealed the order to this Court on 10 April 2012 in *King v. Bryant*, __ N.C. App. __, __, 737 S.E.2d 802, 805 (2013) [hereinafter *King I*]. In an opinion filed 5 February 2013, this Court concluded that the arbitration agreement was not invalid for indefiniteness

regarding the identity of the arbitrators or the procedures to be followed during arbitration. *Id.* at __, 737 S.E.2d at 807–08. We declined, however, to address Plaintiffs' arguments that the arbitration agreement was unconscionable and inapplicable to O'Neal and remanded the case to the trial court with instructions to address those arguments. *Id.* at __, 737 S.E.2d at 808.

A new hearing was held on 21 March 2013. On 10 May 2013, the trial court entered an order again denying Defendants' motion to compel arbitration. The court concluded that the agreement was unenforceable as to King because it was a product of constructive fraud and unconscionability. As to O'Neal, the court concluded that the agreement was not enforceable because she did not sign the agreement and because she neither benefitted nor sought to benefit from the agreement. Defendants appeal.

*II. Appellate Jurisdiction & Standard of Review*

As we noted in *King I*,

> North Carolina law generally permits a party to appeal only from a *final* judgment of the superior court. A final judgment is defined as one which disposes of the cause as to all the parties, leaving nothing to be judicially determined between them in the trial court. However, the [legislature] additionally permit[s] an aggrieved party in

a civil proceeding to appeal from any interlocutory order or judgment of a superior or district court which affects a substantial right.

Here, the trial court's order is not a final disposition of this case; thus, it is interlocutory. However, our courts have held that the denial of a motion to compel arbitration, although interlocutory, is nevertheless immediately appealable, as it affects a substantial right. Therefore, we have jurisdiction to hear Defendants' appeal.

A trial court's determination that an action is subject to arbitration is a conclusion of law which we review *de novo*. Under a *de novo* review, the court considers the matter anew and freely substitutes its own judgment for that of the lower tribunal.

*Id.* at __, 737 S.E.2d at 805-06 (citations, internal quotation marks, brackets, and ellipses omitted; emphasis in original). In addition, the trial court's findings of fact are conclusive on appeal when supported by competent evidence, even where the evidence might have supported findings to the contrary. *See Evangelistic Outreach Ctr. v. Gen. Steel Corp.*, 181 N.C. App. 723, 726, 640 S.E.2d 840, 843 (2007) (affirming the trial court's denial of the defendant's motion to compel arbitration). "Conclusions of law drawn by the trial court from its findings of fact are reviewable *de novo* on appeal." *Carolina Power &*

*Light Co. v. City of Asheville*, 358 N.C. 512, 517, 597 S.E.2d 717, 721 (2004) (citation omitted).

### III. Discussion

On appeal, Defendants argue that the trial court erred by denying their motion to compel arbitration because the arbitration agreement is not a product of constructive fraud and not unconscionable. Defendants also contend that O'Neal is bound by the arbitration agreement despite being a non-signatory. We affirm the trial court's opinion on the grounds that the arbitration agreement is unconscionable. We do not address Defendants' argument as it relates to the applicability of the arbitration agreement to O'Neal.

#### 1. Background

In *King I*, we declined to address the unconscionability and non-signatory issues raised by Plaintiffs because the trial court did not reach those issues in its original order. *Id.* at __, 737 S.E.2d at 808-09. Observing that "the trial court is the appropriate body to determine whether the [arbitration] agreement is unconscionable," we remanded the case with instructions for the court to undertake "any unconscionability analysis . . . with an understanding of the unique nature of the physician/patient relationship." *Id.* at __, 737 S.E.2d at 808.

We also directed the trial court to "apply North Carolina's law of unconscionability" and commented on the following "particularly important" considerations as relevant to the fiduciary nature of the parties' physician/patient relationship:

> While nearly every court to consider the issue has concluded that medical malpractice claims can properly be submitted to arbitration, issues have been raised as to patients' understanding of arbitration contracts and the potentially coercive circumstances under which the agreements are made. The use of arbitration clauses in contracts for healthcare services is distinct from their use in settling labor or commercial disputes because the legal relationship between provider and patient is determined by both private contract law and public tort law. There is tension between contract law, the principles of which have been applied to binding arbitration clauses in labor[] and commercial agreements for years[,] and the application of tort law to enforce conformity with standards of care desired by society, particularly standards of professional care.

*Id.* (citation omitted). In addition, we pointed out that

> [the] fiduciary relationship [carries] an [inherent] affirmative duty to disclose all facts material to a transaction.
>
> Under North Carolina law, fiduciary relationships create a rebuttable presumption that the plaintiff put his trust and confidence in the defendant as a matter of law. Once [the] presumptive fiduciary relationship is alleged, it is the *defendant* who bears the burden of showing he or she acted openly, fairly[,] and honestly in

> bringing about the transaction. This means that the defendant must prove, by the greater weight of the evidence, that, with regard to the transaction, the defendant made a full, open disclosure of material facts, that *he* dealt with the plaintiff fairly, without oppression, imposition or fraud, and that *he* acted honestly.

*Id.* at __, 737 S.E.2d at 809 (citations, internal quotation marks, and brackets omitted; emphasis in original). Lastly, we observed that the "North Carolina Constitution provides a 'sacred and inviolable' right to a jury trial in all controversies at law respecting property" and any agreement waiving that right "must be examined cautiously, especially in situations in which a fiduciary relationship is present, as . . . here." *Id.* at __, 737 S.E.2d at 809 (brackets and certain quotation marks omitted).

"[H]eeding the guidance of the Court of Appeals," the trial court made the following relevant findings of fact and conclusions of law on remand:

FINDINGS OF FACT

. . . .

2. . . . King, now 68, has no educational degree beyond high school and his job requires little reading. He has minimal experience reading legal documents.

3. Defendant[s] . . . [have] experience in managing patient complaints, responding to

claims of medical negligence made by patients, and resolving disputes through arbitration.

4. On April 29, 2009[] Plaintiffs visited Defendants' office for the first time to consult with . . . Bryant about performing laparoscopic surgery on . . . King to repair a hernia. . . . King had been referred to Defendants by his primary care physician.

5. While Plaintiffs were waiting to meet . . . Bryant and consult with him about performing the surgery, Defendants' receptionist provided . . . King with several intake forms to complete and sign. . . . King considered the forms to be a formality.

6. Neither the receptionist, nor . . . Bryant, nor any agent of Defendants called to . . . King's attention the fact that . . . [the arbitration agreement] differed from all of the other forms because it did not concern medical information, insurance information, or payment for the surgery, all routine for a new patient. Nor did anyone disclose to . . . King that the [arbitration a]greement sought to foreclose his access to the judicial process in the event that any dispute arose out of or related to the surgery to be performed by . . . Bryant.

. . . .

8. The [arbitration a]greement does not provide that by signing it, the patient waives his or her right to a trial. The [arbitration a]greement does not include the word "jury" or "judge" or "trial." The [arbitration a]greement does not provide that the patient can consult an attorney before signing it.

9. There is no evidence that [Bryant] or any agent of Defendants discussed with . . . King[] any provision of the [arbitration a]greement.

10. . . . King . . . signed the signature lines on all the forms, including the [arbitration a]greement, without reading them, believing they were all routine forms necessary for his medical care.

11. At the time . . . King signed the [arbitration a]greement and provided his medical information on intake forms, even though he had not yet met . . . Bryant, he was already placing his confidence and trust in Defendants, as demonstrated by his willingness to share his confidential medical information.

12. . . . King was not provided with a copy of the signed [arbitration a]greement, so he had no opportunity to review [it] during the two weeks after he signed it and before his scheduled surgery.

13. Defendants or their agents drafted the [arbitration a]greement, which was identical to form arbitration agreements presented to each new patient at Village Surgical for two years or more prior to . . . King's first office visit.

14. The first, bold-faced paragraph of the [arbitration a]greement is poorly drafted, confusing, and nonsensical. For example, it refers to "the provision of healthcare services by me," suggesting that "me" refers to the physician rather than the patient.

15. The [arbitration a]greement repeatedly refers to arbitration without defining that term. [It] includes no mention whatsoever of the judicial process, a trial, or a jury.

The [arbitration a]greement does not disclose Defendants' intent for . . . King to waive his rights to the judicial process . . . in the event of any claim arising from . . . the surgery. A person of . . . King's education and experience should not reasonably have been expected to know from the language of the [arbitration a]greement, or from any information provided to him by Defendants, that he had a right to a jury trial to resolve any potential dispute with his surgeon. Nor should he have been expected to understand from the language of the [arbitration a]greement or other information provided to him by Defendants that by signing the [arbitration a]greement, he would waive his right to a jury trial.

16. The last sentence of the second paragraph in the [arbitration a]greement starts with complex but complete clauses — "I understand that this agreement is also binding on any individual or entity" — and ends with an incomplete clause — "and not a precondition to receiving health care services" — which contains no verb and assumes the reader infers that the antecedent subject to this clause is the [arbitration a]greement. A person of . . . King's education and experience should not reasonably be expected to understand the last, tacked on, incomplete clause to mean that he did not need to sign the [arbitration a]greement in order for . . . Bryant to perform the surgery.

17. Plaintiff . . . read the [arbitration a]greement after a copy of it was provided to him by his attorney, and he still did not understand its contents or the intended consequence of signing it.

18. Unlike arbitration agreements which have been upheld and enforced in medical

negligence cases, the [arbitration a]greement includes no provision allowing or recommending that the patient consult with an attorney regarding the [arbitration a]greement prior to signing it.

. . . .

20. The [arbitration a]greement's provision requiring at least one physician arbitrator, and its provision allowing all three arbitration panelists to be physicians, confer a benefit to Defendants and a detriment to Plaintiffs. Although physicians are not, based solely on their occupations, excused by courts from serving as jurors in medical negligence cases, the [c]ourt takes judicial notice that counsel for physicians in medical negligence trials generally seek to excuse potential jurors who have previously been party to a negligence case, while counsel for patients in medical negligence trials generally seek to excuse physicians and other medical providers.

. . . .

23. . . . [A] receptionist at Defendant Village Surgical[] stated in a sworn affidavit that the form arbitration agreement is included in "registration paperwork" presented to each new patient when he or she visits the practice for an initial appointment, prior to meeting with a physician. [The receptionist's] affidavit further stated that each new patient is given ample time while waiting in the lobby to ask any questions about any of the documents provided for completion and signature. . . . [She] did not state that she, . . . Bryant, or any agent of Defendant Village Surgical routinely makes any effort to call a new patient's attention to the form arbitration agreement or to explain

that the form seeks to preclude the patient from pursuing a claim against Defendants in the judicial process. It is reasonable to infer from [her] statement that . . . it is the practice of Defendants to obscure the . . . agreement by presenting it among a pile of other documents without pointing it out or explaining its contents.

. . . .

CONCLUSIONS OF LAW

. . . .

3. Defendants were fiduciaries of . . . King as a result of the physician-patient relationship.

4. Defendant[s] . . . breached their fiduciary duties to . . . King by failing to disclose to him all material terms of the [arbitration a]greement and failing to deal with him openly, fairly, honestly, and without imposition, oppression, or fraud in procuring his signature on the [arbitration a]greement.

5. The fact that . . . King did not read the [arbitration a]greement before signing it does not preclude his objection to its terms because the provisions of the [arbitration a]greement are far from clear and unequivocal.

6. The [arbitration a]greement is a product of constructive fraud and is therefore unenforceable.

7. The [arbitration a]greement is unconscionable and is therefore unenforceable.

2. *The Validity of the Arbitration Agreement as to King*

Defendants do not argue that the trial court's findings of fact are not based on competent evidence.[1] Rather, they assert that a fiduciary relationship did not exist between the parties at the time King signed the arbitration agreement, which "indicates that the events surrounding the execution of the arbitration agreement did not involve constructive fraud," and argue that the arbitration agreement did not suffer from procedural or substantive unconscionability as a matter of law. We disagree.

*A. Fiduciary Relationship and Constructive Fraud*

Defendants assert that a fiduciary relationship did not exist at the time King signed the arbitration agreement because Bryant had not yet accepted King as a patient. Therefore, Defendants argue, the execution of the agreement did not involve constructive fraud. We lack authority to address this issue on its merits.

In *King I*, we stated that a fiduciary relationship existed between the parties and directed the trial court to consider that fact on remand. __ N.C. App. at __, 737 S.E.2d at 809 (observing that "considerations [of unconscionability] are

---

[1] Therefore, the trial court's findings are presumed to be supported by competent evidence and are binding on appeal. *See Koufman v. Koufman*, 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991).

particularly important given the fact that the physician/patient relationship is a fiduciary one" and directing the trial court to "be mindful of [the] burden shifting framework [applicable when the parties have a fiduciary relationship] in evaluating Plaintiffs' argument that the [arbitration a]greement is unconscionable"). That conclusion constitutes the law of the case and cannot be disturbed by a subsequent panel of this Court. *See N.C. Nat'l Bank v. Va. Carolina Builders*, 307 N.C. 563, 567, 299 S.E.2d 629, 631–32 (1983) ("[O]nce a panel of the Court of Appeals has decided a question in a given case that decision becomes the law of the case and governs other panels which may thereafter consider the case. Further, since the power of one panel of the Court of Appeals is equal to and coordinate with that of another, a succeeding panel of that [C]ourt has no power to review the decision of another panel on the same question in the same case."). As a result, we are bound for purposes of this opinion by the prior panel's determination that a fiduciary relationship existed between the parties.[2] Thus,

---

[2] Defendants limit their argument regarding constructive fraud to an assertion that the lack of a fiduciary relationship between King and Bryant "indicates the events surrounding the execution of the arbitration agreement did not involve constructive fraud." Because we are bound by the previous panel's determination that a fiduciary relationship did exist between

pursuant to our opinion in *King I*, a rebuttable presumption exists that King "put his trust and confidence in [Bryant] as a matter of law," and Defendants bear the burden of showing that they acted openly, fairly, and honestly in bringing about the transaction in this case. *See King*, __ N.C. App. at __, 737 S.E.2d at 809.

### B. Unconscionability

Six years ago, in *Tillman v. Commercial Credit Loans, Inc.*, our Supreme Court described the general unconscionability defense to contract formation in the context of an arbitration agreement as follows:

> Arbitration is favored in North Carolina. *As with any contract, however*, equity may require invalidation of an arbitration agreement that is unconscionable. A court will find a contract to be unconscionable only when the inequality of the bargain is so manifest as to shock the judgment of a person of common sense, and where the terms are so oppressive that no reasonable person would make them on the one hand, and no honest and fair person would accept them on the other.
>
> An inquiry into unconscionability requires that a court consider all the facts and circumstances of a particular case, and if the provisions are then viewed as so one-sided that the contracting party is denied

---

the parties at the time King signed the agreement, Defendants' argument as it pertains to constructive fraud is overruled.

any opportunity for a meaningful choice, the contract should be found unconscionable.

. . . .

[To be considered unconscionable, a contract must be the result of] both procedural and substantive unconscionability. . . .

. . . [P]rocedural unconscionability involves "bargaining naughtiness" in the form of unfair surprise, lack of meaningful choice, and an inequality of bargaining power. Substantive unconscionability, on the other hand, refers to harsh, one-sided, and oppressive contract terms. Of course, unconscionability is ultimately a determination made in light of a variety of factors not unifiable into a formula. Therefore, . . . while the presence of both procedural and substantive problems is necessary for an ultimate finding of unconscionability, such a finding may be appropriate when a contract presents pronounced substantive unfairness and a minimal degree of procedural unfairness, *or vice versa*.

362 N.C. 93, 101-03, 655 S.E.2d 362, 369-70 (2008) (citations, certain brackets, and certain internal quotation marks omitted; emphasis added). The plaintiffs in *Tillman* were residents of North Carolina with "limited financial resources" who had applied for and received private, commercial loans from the defendants. *Id.* at 94, 655 S.E.2d at 365. During the process of contracting with the defendant loan companies, the plaintiffs were sold loan insurance plans and agreed to resolve all

disputes through binding arbitration under the Federal Arbitration Act ("FAA"). *Id.* at 94–95, 655 S.E.2d at 365. The plaintiffs later brought suit against the defendants on grounds that they were improperly induced to purchase the insurance. *Id.* at 96–97, 655 S.E.2d at 366. The defendants moved to compel arbitration, and the case was eventually appealed to the Supreme Court. *Id.*

On appeal, our Supreme Court held that the arbitration clauses in the parties' agreements was substantively unconscionable because (1) the costs borrowers could face under the clauses were prohibitively high; (2) the clauses were drafted solely by the defendants and, thus, lacked mutuality; and (3) the clauses prohibited the joinder of claims and class actions. *Id.* at 104, 655 S.E.2d at 370–71. The "collective effect" of these characteristics, the Court concluded, was "that [the] plaintiffs [were] precluded from effectively vindicating their rights in the arbitral forum." *Id.* (citation, internal quotation marks, brackets, and ellipsis omitted).

Since *Tillman*, the United States Supreme Court has issued two important opinions on the use of state law to set aside an arbitration agreement when that agreement is governed by the FAA: *AT&T Mobility v. Concepcion*, __ U.S. __, 179 L. Ed. 2d 742

(2011) (determining that the FAA preempted California's judicial rule prohibiting class waivers in consumer arbitration agreements contained within contracts of adhesion) and *American Express Co. v. Italian Colors Rest.*, __ U.S. __, 186 L. Ed. 2d 417 (2013) (holding that the FAA does not permit courts to invalidate an arbitration agreement on the grounds that it does not permit class arbitration). This Court recently addressed those opinions and their impact on *Tillman* in *Torrence v. Nationwide Budget Fin.*, __ N.C. App. __, 753 S.E.2d 802, *disc. review denied*, __ N.C. __, __ S.E.2d __ (2014).

In *Torrence*, the plaintiffs applied for and received a number of loans, each of which contained an arbitration clause. *Id.* at __, 753 S.E.2d at 803. The clauses were drafted entirely by the defendants; stipulated that arbitration would be governed by the FAA; included an agreement not to bring, join, or participate in a class action against the defendants; and provided notice in bold, capital letters that the parties:

> **WOULD HAVE HAD A RIGHT OR OPPORTUNITY TO LITIGATE DISPUTES THROUGH A COURT AND HAVE A JUDGE OR JURY DECIDE THE DISPUTES BUT HAVE AGREED INSTEAD TO RESOLVE DISPUTES THROUGH BINDING ARBITRATION.**

*Id.* at __, 753 S.E.2d at 804 (emphasis in original).

Addressing the Supreme Court's opinion in *Concepcion*, the *Torrence* Court observed the following:

> The Supreme Court held that [section 2 of the FAA][3] permits arbitration agreements to be declared unenforceable upon such grounds as exist at law or in equity for the revocation of any contract. This saving clause permits agreements to arbitrate to be invalidated by generally applicable contract defenses, such as fraud, duress, and unconscionability, but not by defenses that apply *only to arbitration* or that *derive their meaning from the fact that an agreement to arbitrate is at issue*.
>
> . . . [A]lthough [section] 2's saving clause preserves generally applicable contract defenses, nothing in it suggests an intent to preserve state-law rules that stand as an obstacle to the accomplishment of the FAA's objectives. . . . [T]he FAA supersedes any state law that sets aside arbitration agreements or holds them to be unconscionable *upon grounds that are exclusive to arbitration agreements*.

---

[3] Section 2 of the FAA provides that:

> A written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2 (2012).

*Id.* at __, 753 S.E.2d at 809 (citations and internal quotation marks omitted; emphasis added).

With regard to the impact of the Supreme Court's opinions in *Concepcion* and *Italian Colors* on *Tillman*, we stated that "[w]hile both *Concepcion* and *Italian Colors* dealt with class action waivers, underlying those decisions was a broader theme that *unconscionability attacks that are directed at the arbitration process itself will no longer be tolerated*." *Id.* at __, 753 S.E.2d at 811 (citation omitted; emphasis added). Accordingly, we concluded that "the legal theories upon which *Tillman*'s substantive unconscionability analysis is based have been undermined by subsequent decisions of the United States Supreme Court in the context of cases under the FAA." *Id.* at __, 753 S.E.2d at 812. Specifically, we held that (1) the "prohibitively high" cost factor is no longer applicable to an unconscionability analysis; (2) an agreement's lack of mutuality, alone, is not sufficient to justify a finding of substantive unconscionability; and (3) the prohibition of joinder of claims and class actions does not render an arbitration agreement unconscionable. *Id.* at __, 753 S.E.2d at 811–12.

In this case, the FAA governs the parties' arbitration agreement. *King I*, __ N.C. App. at __, 737 S.E.2d at 806. Therefore, to support the trial court's determination that the agreement is unconscionable, that determination must comport with our Supreme Court's general description of the elements of unconscionability as laid out in *Tillman*, the objectives of the FAA as addressed by the United States Supreme Court in *Concepcion* and *Italian Colors*, and our application of those cases to the unconscionability analysis as explained in *Torrence*. After careful review, we conclude the trial court correctly determined that the arbitration agreement here is unconscionable.

*i. Procedural Unconscionability*

Defendants argue that the arbitration agreement did not suffer from procedural unconscionability because evidence at the hearing suggests that King was not "rushed to complete the paperwork," the agreement was prominently displayed as a separate document, the language in the agreement was clear that it was "not a precondition to receiving health care services," and King had more than a week to sign the agreement before surgery. We are unpersuaded.

First, we note that Defendants do not argue that they took any *active* steps, in accordance with their fiduciary duty, to make a "full, open disclosure of material facts" to King before he signed the arbitration agreement. At most, they assert that they did not hinder King's ability to complete the paperwork and that the agreement, on its own, was not so obfuscatory as to render its presentation procedurally unconscionable. This is not sufficient to meet their burden of showing that they acted openly, fairly, and honestly in bringing about the transaction. As such, the mere fact that King was not rushed to complete the "pile" of documents he was asked to sign is not, in this case, sufficient to show a lack of procedural unconscionability.

In addition, the fact that the agreement was displayed as a separate document, with bold lettering at the top, and included the language "not a precondition to receive medical services" does not establish that the agreement was valid and enforceable. As the trial court observed in its order,

> [g]iven the fiduciary relationship between the parties here, the complete absence of any mention of waiver, of the judicial process, of a trial, or of a jury in the [arbitration a]greement, the failure of the physician or any of his agents to explain the waiver intended to be procured by the [arbitration a]greement, and the [arbitration a]greement's convoluted sentence structure and undefined legalistic

terms, this case involves evidence of pronounced procedural unfairness.

In the waiting room on his first visit to Bryant, King was presented with a "pile" of documents to sign, the majority of which required him to include the usual and necessary medical, insurance, and payment information. The arbitration agreement was a part of that pile. The agreement itself lacked any reference to the judicial process or King's constitutional right to a jury trial, omitting the words "jury," "judge," or "trial." The agreement did not define the term "arbitration" and included a "convoluted" sentence at the end, which — among other things — omitted the verb necessary to understand the meaning of the "not a precondition to receive medical services" language. Given Defendants' fiduciary duty as well as the defects in the presentation and language of the agreement, even accepting *arguendo* that the agreement was "prominently displayed," Defendants have failed to establish that the agreement was not procedurally unconscionable. *Cf. Westmoreland v. High Point Healthcare Inc.*, __ N.C. App. __, __, 721 S.E.2d 712, 718 (2012) (concluding that an arbitration agreement was not procedurally unconscionable when it advised the plaintiff of her right to consult with an attorney, advised her of her right to receive an explanation or clarification from staff, and provided that she

was not required to sign it in order for her father to be admitted to the facility).

Lastly, the fact that King had "more than a week" before surgery to review and sign the agreement does not save Defendants' argument. The trial court's unchallenged findings of fact state clearly that King was not given a copy of the arbitration agreement to take with him when he went home. Thus, even assuming this extra time would have affected the validity of the agreement, King was not able to take advantage of it.

Given (1) the fact that we analyze the agreement here in the context of the fiduciary duty Defendants owed King, (2) the disparate levels of sophistication between the parties, (3) the nature of the delivery of the agreement, and (4) *Defendants' burden* because of their fiduciary duty to King to provide full and open disclosure of the material facts surrounding the transaction between the parties, we hold that the arbitration agreement suffered from significant procedural unconscionability. King did not have a meaningful choice between whether to sign the agreement or not. Accordingly, Defendants' argument is overruled.

*ii. Substantive Unconscionability*

Defendants argue that the arbitration agreement was not a product of substantive unconscionability because the requirement of at least one physician arbitrator is irrelevant to the issue of unconscionability, citing a number of cases from other jurisdictions. Defendants also assert that the agreement is not unconscionable because arbitration is not prohibitively expensive for Plaintiffs. Pursuant to our opinion in *Torrence*, *surpa*, we agree with Defendants that the cost of arbitration and the selection of a particular arbitrator is not relevant to the issue of substantive unconscionability. Nonetheless, we conclude that the particular terms of this contract evidence a lack of substantive fairness which, when coupled with Defendants' fiduciary duty, constitutes some evidence of substantive unconscionability.

Here, unlike *Torrence*, the arbitration agreement includes no reference to King's right to litigate any future dispute in a court of law. The agreement does not mention that King is forfeiting his right to a jury or a judge. Moreover, the only element of the agreement that attempts to communicate to the would-be signor — here, King — that he is not required to accept the agreement in order to see his physician is incomprehensible. These failures result in a harsh, one-sided, and oppressive

instrument that is, at least in part, substantively unconscionable. As a result, an order compelling arbitration would preclude King from fully and effectively vindicating his rights. Accordingly, we hold that the trial court did not err by denying Defendants' motion to compel arbitration on grounds that the agreement is substantively unconscionable.

*IV. Conclusion*

As our Supreme Court stated in *Tillman* and this Court reiterated in *Torrence*, an ultimate finding of unconscionability may be made when the contract presents a pronounced measure of procedural unfairness and only a minimal degree of substantive unfairness or *vice versa*. *Tillman*, 362 N.C. at 103, 655 S.E.2d at 370; *Torrence*, __ N.C. App. at __, 753 S.E.2d at 807. Numerically speaking, a contract may be considered unconscionable when it suffers from even 99% procedural unconscionability and only 1% substantive unconscionability or *vice versa*. *See Tillman*, 362 N.C. at 103, 655 S.E.2d at 370; *Torrence*, __ N.C. App. at __, 753 S.E.2d at 807. Here, King signed the agreement pursuant to a pronounced measure of procedural unconscionability and an adequate measure of substantive unconscionability. This is sufficient to support an ultimate finding of unconscionability.

We also point out that, unlike the arbitration agreements in *Tillman*, *Concepcion*, *Italian Colors*, and *Torrence*, this agreement is unconscionable because of Defendants' failure to properly prepare and present the arbitration agreement to King in the context of their confidential, physician-patient, fiduciary relationship. If the agreement had included suitable notice provisions and Defendants had satisfied their duty to affirmatively disclose all facts material to the transaction, the arbitration agreement would have been enforceable. Thus, our application of the unconscionability defense in this case is not a broad condemnation of arbitration agreements in general, the arbitration process itself, or arbitration agreements employed in the physician-patient context. Indeed, we acknowledge the strong public policy in favor of arbitration under North Carolina law and the FAA. Nonetheless, we must conclude that in the limited factual circumstances presented here, Defendants submitted an agreement to King that was unconscionable by its terms — or lack thereof — and the manner of its presentation, eliminating any meaningful choice on the part of King. Therefore, under section 2 of the FAA and our State's general contract formation defense of unconscionability, we hold that

the arbitration agreement is invalid. Accordingly, the trial court's order is affirmed.[4]

AFFIRMED.

Judges HUNTER, ROBERT C., and STEELMAN concur.

Report per Rule 30(e).

---

[4] Because we affirm the trial court's order denying Defendants' motion to compel arbitration, we need not determine whether the arbitration agreement is applicable to O'Neal.